KATIE OWUSU, HADAR HAIKA, and )
JEAN GARD, on behalf of themselves )
and all others similarly situated, )
)
        Plaintiffs, )
)
vs. )
)    Case No.
MYTECHHELP LLC, a Florida limited )
liability company, )
)
Serve:  Reid Shapiro )    **CLASS ACTION COMPLAINT**
         5259 Coconut Creek Pkwy. )
         Margate, FL 33063 )    **JURY TRIAL DEMANDED**
)
and )
)
ELEPHANT GROUP INC., a Delaware )
corporation, )
)
Serve: Reid Shapiro )
        5259 Coconut Creek Pkwy. )
        Margate, FL 33063 )
)
and )
)
SAVEOLOGY.COM LLC, a Florida )
limited liability company, )
)
Serve:  Michael Wallace )
         5259 Coconut Creek Pkwy. )
         Margate, FL 33063 )
)
and )
)
TECHZILLA TECHNICAL SERVICES LLC, )
a Florida limited liability company, )
)
Serve:  Michael Wallace )
         5259 Coconut Creek Pkwy. )
         Margate, FL 33063 )
)
        Defendants. )

## CLASS ACTION COMPLAINT

Plaintiffs Katie Owusu, Hadar Haika, and Jean Gard, by and through their undersigned counsel, bring this action on their own behalf and on behalf of a Class and Subclass of persons and entities defined herein against Defendants MyTechHelp LLC, Elephant Group Inc., Saveology.com LLC, and Techzilla Technical Services LLC, and for their Complaint allege, upon personal knowledge as to themselves and their own experiences, and as to all other matters upon information and belief and based on the investigation conducted by their counsel, as follows:

### INTRODUCTION

1.      This class action is brought to remedy violations of state and federal consumer protection laws in connection with the Defendants deceptive business practices.  This action asserts claims for violations of the Electronic Funds Transfer Act, the Missouri Merchandising Practices Act, conversion, and unjust enrichment.

2.      Defendant MyTechHelp, in collusion with and to the benefit of the other Defendants, markets itself to consumers around the country as "tech support" for numerous electronic devices.  Defendants knowingly and purposefully communicate with consumers in a deceptive manner.  Specifically, Defendants' marketing and sales tactics are meant to intentionally deceive consumers into believing they have contacted a specific product manufacturer or service provider for qualified and specialized technical support, when consumers have in fact contacted MyTechHelp, an unaffiliated and unqualified service provider.  Over the telephone, MyTechHelp agents request the consumer's personal debit/bank account or credit card information for payment of the tech support service.  After the consumer provides

their debit/credit card number, MyTechHelp initiates unauthorized charges to the unknowing consumer's account.

3.     Upon information and belief, Defendants' pattern of unlawful practices, which culminate with unauthorized charges to consumer bank/debit accounts and credit cards, has defrauded hundreds, if not thousands, of consumers across the United States.

**JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one class member is a citizen of a state different than the Defendants.  In addition, this Court has subject matter jurisdiction pursuant to the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.*, which states that "[w]ithout regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."

5.     This Court has personal jurisdiction over the Defendants because they transact significant amounts of business in Missouri with residents of Missouri, and have sufficient contacts with Missouri or otherwise intentionally avail themselves of the laws and markets of Missouri.

6.     Venue is proper in the United States District Court for the Western District of Missouri under 28 U.S.C. § 1391(a) as at least one plaintiff's injury arose in this District.  Venue is additionally proper in this District because at least one plaintiff was injured by the Defendants in this District, and the Defendants transact a significant amount of business in this District, including soliciting consumer business and entering into consumer transactions.  In addition,

venue is appropriate for the claims arising out of the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.*, because the statute applies to any company engaging in any of the activities regulated by the statute within the State of Missouri.

<u>**THE PARTIES**</u>

7.     Plaintiff Katie Owusu is an individual who at all times relevant herein resided, and continues to reside, in Oceanside, California.

8.     Plaintiff Hadar Haika is an individual who at all times relevant herein resided, and continues to reside, in New York, New York.

9.     Plaintiff Jean Gard is an individual who at all times relevant herein resided, and continues to reside, in Independence, Missouri.

10.     Plaintiffs Owusu, Haika, and Gard will hereinafter be collectively referred to as "Plaintiffs."

11.     Plaintiffs, each of them, were victims of Defendants' deceptive practices which include MyTechHelp's act of charging fees to their debit/bank accounts without Plaintiffs' prior knowledge, consent and/or written authorization.

12.     Upon information and belief, Defendant MyTechHelp LLC (hereinafter referred to as "MyTechHelp") is and was at all times relevant herein a Florida limited liability company that owns and operates a technical support service.  MyTechHelp maintains its corporate headquarters and principal place of business at 5259 Coconut Creek Parkway in Margate, Florida 33063.  MyTechHelp's registered agent is Reid Shapiro, 5259 Coconut Creek Parkway, Margate, Florida 33063.  MyTechHelp's manager is Defendant Elephant Group Inc.

13.     Upon information and belief, Defendant Elephant Group Inc. (hereinafter referred to as "Elephant Group") is and was at all times relevant herein a Delaware corporation.  Elephant

Group is the direct parent corporation of MyTechHelp and its related businesses, including Defendant Saveology.com LLC and Defendant Techzilla Technical Services LLC. Elephant Group maintains its corporate headquarters and principal place of business at 5259 Coconut Creek Parkway in Margate, Florida 33063. Elephant Group's registered agent is Reid Shapiro, 5259 Coconut Creek Parkway, Margate, Florida 33063. Benzion Aboud is the Chief Executive Officer of Elephant Group, and the Principal of MyTechHelp, Defendant Saveology.com LLC and Defendant Techzilla Technical Services LLC. Elephant Group describes itself as "a complete performance-based marketing solution to target, obtain and retain quality customers."

14.     Upon information and belief, Defendant Saveology.com LLC (hereinafter referred to as "Saveology") is and was at all times relevant herein a Florida limited liability company that owns and operates a technical support service. Namely, MyTechHelp is the technical support division of Saveology. Saveology maintains its corporate headquarters and principal place of business at 5259 Coconut Creek Parkway in Margate, Florida 33063. Saveology's registered agent is Michael Wallace, 5259 Coconut Creek Parkway, Margate, Florida 33063. Saveology's manager is Elephant Group.

15.     Upon information and belief, Defendant Techzilla Technical Services LLC (hereinafter referred to as "Techzilla") is and was at all times relevant herein a Florida limited liability company that owns and operates a technical support service. Techzilla maintains its corporate headquarters and principal place of business at 5259 Coconut Creek Parkway in Margate, Florida 33063. Techzilla's registered agent is Michael Wallace, 5259 Coconut Creek Parkway, Margate, Florida 33063. Techzilla's manager is Elephant Group.

## DEFENDANTS' CORPORATE RELATIONSHIP

16.     Upon information and belief, MyTechHelp, Elephant Group, Saveology and Techzilla (hereinafter collectively referred to as "Defendants") share the same corporate headquarters and principal place of business, and share the same founder and principal, Benzion Aboud.  Defendants communicate with consumers from numerous call centers located in the United States and other countries.

17.     Defendants at all times relevant herein aided and abetted, encouraged and rendered substantial assistance to each other in the deceptive and unlawful acts described more fully herein.  In taking such action, Defendants mutually acted with an awareness of the primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals and wrongdoing.

18.     In addition to acting on their own behalf individually, Defendants, each of them, are and were acting as the agent, servant, employee, joint venture, and representative of, and with the knowledge, consent and permission of, and in the conspiracy with each other Defendant and within the course, scope and authority of that agency, service, employment, representation, joint venture, and conspiracy.  Defendants' conduct was fully ratified by the other.  Thus, the actions, failures, breaches, misrepresentations and other wrongdoing alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and done with the cooperation and knowledge of each and all of the Defendants.

19.     Upon information and belief, although each company maintains its headquarters in Florida, Defendants use deceptive and unlawful marketing and sales practices to reach and conduct business with consumers in all 50 states and the District of Columbia.

## FACTUAL BACKGROUND

### DECEPTIVE MARKETING & SALES TACTICS OF MYTECHHELP

20.     Defendants' business consists of billing consumers for products and services which Defendants' claim to provide consumers. MyTechHelp claims to offer remote technical support for smart phones, laptop computers, PCs, tablets, and numerous other electronic devices.

21.     When the owner of an electronic device is experiencing technical problems with their device, they are likely to contact the device's manufacturer or an affiliated service provider. MyTechHelp has devised a scheme to intercept these consumers through deceptive marketing and sales tactics.

22.     At all relevant times herein, MyTechHelp has purchased "advertising" space from the popular internet search engine Google. Through a program known as "cost-per-click" advertising, MyTechHelp purchases certain key words. When a consumer enters those key words into the search engine, MyTechHelp's "advertisement" appears on the screen above all other search results.

23.     Upon information and belief, MyTechHelp has purchased key words such as "apple tech support", "call samsung tech support", "apples number", "gateway tech help", "applecare phone number usa", and many other tech related key words. By purchasing such specific keywords, MyTechHelp is purposefully marketing itself toward consumers who are attempting to find information related to the official technical support division of a particular device manufacturer. For example, consumers who type "applecare phone number usa" are quite clearly looking for the phone number of the official technical support division of Apple Inc. [1]

---

[1] Many of the keywords purchased by MyTechHelp are federally registered trademarks or service marks. For example, AppleCare is a federally registered service mark of Apple Inc.

Case 4:13-cv-00896-DW   Document 1   Filed 09/13/13   Page 7 of 35

24.     This deceptive marketing campaign has been used to attract owners of Apple products as well as owners of products manufactured by numerous companies including, but not limited to Sony, Samsung, HP, Gateway, Asus, Compaq and many others.  The deceptive activities described herein amount to a fraud on the entire market.

25.     When a consumer who needs technical assistance with an Apple product enters Apple related key words into their internet search engine, the top listing provides a telephone number for "Apple Support" and includes a web address for "apple.support.mytechhelp.com/."

26.     The content of MyTechHelp's "advertisement" misleads consumers into believing that the telephone number is for the "real" Apple, when in fact the telephone number is for MyTechHelp.

27.     The following screen image depicts what consumers see when they enter key words such as "Apple tech support" into their internet search engine attempting to find the "real" Apple technical support:



28.     By including "apple.support" in its domain name, MyTechHelp is fully aware that consumers are likely to believe that the listed phone number will connect them to the "real" Apple.

29.     When the unsuspecting consumer calls the listed phone number under the false belief that they are calling Apple, the MyTechHelp salesperson continues the charade by telling the caller that they have reached "Apple tech support."

30.     Upon information and belief, regardless of the consumer's technical problem, the MyTechHelp salesperson tells the consumer that the manufacturer's warranty has expired (or will soon expire), and that the consumer needs to purchase a "support plan" in order to resolve the technical problem.  The salesperson tells the consumer that the "support plan" costs a one-time fee ranging from $69.99 to $199.99.  Depending on the type of electronic device, the salesperson may offer "anti-virus protection" for a one-time fee of $59.99.  If the consumer balks, the salesperson attempts to scare the consumer by telling them that if they do not purchase the "support plan" or "anti-virus protection", their device will likely crash, their private information could be obtained by a hacker, and/or their device will never operate properly again. The salesperson promises a rebate that will considerably decrease the price of the "support plan" or "anti-virus protection."

31.     Throughout the phone call with MyTechHelp, the consumer is led to believe that they are speaking with the tech support division of the device's manufacturer or an affiliated service provider, which MyTechHelp is neither.

### DECEPTIVE MARKETING AND SALES TACTICS OF ELEPHANT, SAVEOLOGY & TECHZILLA

32.     In addition to deceptively marketing MyTechHelp through Google's cost-per-click feature, the other Defendant companies route consumers to MyTechHelp salespersons using similar deceptive marketing and sales tactics.

33.     Upon information and belief, Techzilla operates as a technical support company with the same business model as MyTechHelp.  Techzilla and MyTechHelp are owned and

operated by the same parent company, Elephant Group. Consumer callers of Techzilla are often transferred to MyTechHelp salespersons and are thereafter subject to the same deceptive tactics as described above.

34. Upon information and belief, Elephant Group "advertises" in a manner similar to that described above in attempting to intercept consumers who are looking to have cable television or high speed internet connected by a local service provider. Consumers are led to believe that they have contacted a telecommunications company such as Time Warner or Comcast, but they have actually contacted Elephant Group or one of its related companies. Consumer callers of Elephant Group are often transferred to MyTechHelp salespersons and are thereafter subject to the same deceptive tactics as described above.

35. Upon information and belief, Saveology operates as a company selling discounted "deals" to restaurants, hotels, and other goods and services. Consumer callers of Saveology are often transferred to MyTechHelp salespersons and are thereafter subject to the same deceptive tactics as described above.

36. The Defendants operate in concert to deceive consumers for the purpose of obtaining bank/debit account or credit card information.

**UNAUTHORIZED CHARGES**

37. When the consumer agrees to purchase the "support plan" or "anti-virus protection" or both, the MyTechHelp salesperson asks for the consumer to provide their bank/debit account or credit card information for payment of the one-time fee. The consumer then provides the salesperson their bank/debit account or credit card information and verbally authorizes the payment of a one-time charge. MyTechHelp initiates and secures a payment from the consumer's bank/debit account or credit card.

38.     Without the consumer's authorization, MyTechHelp then frequently initiates recurring charges from the consumer's bank/debit account or credit card.

39.     If the consumer refuses to purchase MyTechHelp's "support plan" or "anti-virus protection," the consumer may still incur recurring charges from MyTechHelp if the consumer previously provided bank/debit account or credit card information to one of the other Defendants when purchasing an unrelated product/service (i.e., cable connection from Elephant Group, diner's deal card from Saveology, or PC battery from Techzilla). The consumer may incur recurring charges from MyTechHelp even though the consumer was never even offered a MyTechHelp product or service.

40.     The consumer's interactions with MyTechHelp are exclusively via the telephone. At no time does the consumer sign anything authorizing a charge or recurring charge from MyTechHelp. At no time does MyTechHelp provide a copy of any such written authorization.

41.     The marketing and sales techniques described herein are not designed to elicit meaningful consent from consumers to be billed for a MyTechHelp service or product. Instead, the scheme is designed to give MyTechHelp a pretext upon which to initiate charges to the consumer's account.

**POST TRANSACTION CONDUCT**

42.     Upon information and belief, MyTechHelp's "services" are generally useless to the consumer. MyTechHelp "specialists" generally misdiagnose the technical problem because they are pushing the sale of a particular product (i.e., anti-virus software) regardless of its usefulness to a particular consumer. As discussed herein, many consumers are unaware that they ever spoke to MyTechHelp, and are equally unaware that they "purchased" anything. Without knowledge of their supposed purchase, consumers could not get the benefit of MyTechHelp's

service/product even if such a benefit existed. Although Defendants know that MyTechHelp's services are essentially worthless under these circumstances, Defendants continue their aggressive marketing and sales tactics without regard to the fact that consumers receive nothing of value in exchange for payments to MyTechHelp.

43.     Upon information and belief, the "rebate" that was promised by the MyTechHelp salesperson never comes. When a consumer calls to inquire or complain about the missing rebate, the consumer only receives more misrepresentations from the salesperson. For example, the salesperson may tell the consumer that the rebate will be sent out in 4-6 weeks or that the paperwork needs to be re-sent due to a clerical error. Still, the rebate never comes. When consumers call to complain, they are put on hold for long periods of time, passed around the MyTechHelp call center from one unhelpful salesperson to the next, and/or hung up on. Eventually, the consumer gives up trying to get the rebate which was promised by the MyTechHelp salesperson.

44.     Defendants' business practices systematically generate hundreds, if not thousands, of complaints from individuals who state that (a) they have been billed for a MyTechHelp service/product they never heard of; (b) they have no idea how they came to be charged by MyTechHelp for a MyTechHelp service/product; and (c) they never authorized MyTechHelp to charge their bank/debit account or credit card. Defendants are aware of these complaints but make no effort to remedy or suspend the practices which give rise to the complaints.

45.     MyTechHelp exploits the fact that many consumers will not recognize the unauthorized charges until they have been billed for months or even years. Consumers who attempt to cancel or contest MyTechHelp's billing of past charges encounter a variety of techniques designed to obstruct and discourage their efforts to get their money back and stop the

recurring charges. When a consumer finally realizes that MyTechHelp has been unlawfully charging them without authorization, the consumer will call MyTechHelp to cancel and request a refund. During the phone call, the consumer is placed on hold for long periods of time, passed around the MyTechHelp call center from one unhelpful salesperson to the next, and/or hung up on.

46.     When a consumer requests to listen to the audio recording of the alleged "authorization," MyTechHelp's agents, representatives, and employees routinely instruct the consumer that an independent third party will review the audio recording and issue a decision as to whether the consumer authorized the charges. Consumers are told that MyTechHelp will call them once the results of the independent audio review have arrived. MyTechHelp never calls with the results of the audio review.

47.     MyTechHelp's agents, representatives, and employees routinely fail to honor cancellation requests or refund unauthorized charges. The consumer is often left with no choice but to cancel her debit/bank account or credit card. While MyTechHelp occasionally refunds unauthorized charges, the refunds are either partial refunds or full refunds made to particularly sophisticated or tenacious individuals. Even so, the consumer has already suffered the cost of her time and resources.

48.     Defendants' business practices are particularly oppressive to persons of limited means. By placing unauthorized charges on consumer credit and debit/bank accounts, MyTechHelp causes consumers to incur additional finance charges, bounced check and NSF charges, exceed credit limits, violate minimum payment requirements (often triggering high interest rates), violate minimum balance requirements, and receive adverse credit notations.

49.     Upon information and belief, Defendants continue to perpetrate the above described fraud at the present time.

**PLAINTIFFS' EXPERIENCES**

**KATIE OWUSU**

50.     Plaintiff Katie Owusu was experiencing problems with her Dell laptop computer battery.  On or around July 9, 2013, she searched for Dell's phone number on the internet.  She called the number listed for Dell tech support.  At the time, Owusu did not know that she had called MyTechHelp.

51.     A MyTechHelp salesperson named "Jerry" told Owusu that the problem with her Dell computer could be resolved with certain computer hardware at a price of $89.99.  Jerry told her that after the rebate, the entire cost would amount to only $14.99 for shipping and handling.  Owusu agreed to purchase the hardware, and then provided Jerry with her debit/bank card account information.

52.     A few days later, Owusu learned from her son that her Dell laptop simply needed a new battery which could be purchased for a cheap price at a local store.

53.     Owusu checked her bank account and saw that she had been charged twice by MyTechHelp in the amount of $104.98 each time.  On or about July 13, 2013, Owusu called to cancel the order.  She was surprised to learn that she had not placed an order with Dell, but rather MyTechHelp.  She asked how she ended up speaking to MyTechHelp when she tried to call Dell.  She did not receive a clear answer.  At that time, Owusu cancelled her order and requested a refund of both charges.

54.     In the coming days, $104.98 was credited to her bank account from MyTechHelp, but the other $104.98 was still missing from her account.  She called MyTechHelp on several

occasions to request the refund of the other $104.98. The MyTechHelp salesperson finally instructed Owusu to contact a manager at Saveology if she wanted to get refunded the other $104.98. The salesperson explained that Saveology and MyTechHelp are the same company.

55. In mid-August, 2013, Owusu noticed that a recurring $9.99 charge from MyTechHelp had been withdrawn from her bank account.

56. At no time did MyTechHelp provide any service or product to Owusu.

57. At no time did Owusu authorize MyTechHelp to withdraw $9.99 from her bank account on a recurring basis.

58. At no time did Owusu sign anything authorizing such a recurring charge.

59. At no time did MyTechHelp provide Owusu a copy of any such written authorization.

### HADAR HAIKA

60. In or around February 2012, Plaintiff Hadar Haika contacted Time Warner to inquire about Time Warner's cable television and internet service plans. At the time of the phone call, Haika had no reason to believe that she was speaking to anyone other than a sales representative for Time Warner.

61. Haika agreed to purchase a cable/internet plan from Time Warner during this initial phone conversation. Haika provided the sales representative with her debit/bank account information for payment.

62. After speaking to Time Warner, Haika found a more affordable and convenient cable/internet plan through a different company. She called Time Warner and instructed the representative that she wanted to cancel the cable/internet plan for which she had previously registered. The sales representative explained that since the cable/internet had not yet been

installed, Haika was able to cancel the service without incurring any charges on her debit/bank account. Haika made it very clear that she wished to cancel her Time Warner order, and that she did not want to be charged anything. The sales representative made it very clear that Haika would not be charged anything. Time Warner never charged Haika's debit/bank account.

63.     In or around June 2013, Haika noticed that a company named "MyTechHelp" had been electronically withdrawing $9.99 from her debit/bank account on a monthly basis since February 25, 2012. Haika had never heard of MyTechHelp, and had never purchased anything from MyTechHelp. She contacted her bank and requested that no further charges be withdrawn.

64.     Haika contacted MyTechHelp to dispute the charges. Haika spoke to several salespersons who refused to provide her with any helpful information. She was placed on hold multiple times for a significant amount of time. Finally, she spoke to a MyTechHelp agent named "Marvin" who claimed to be a manager. Marvin told Haika that she agreed to purchase a MyTechHelp tech support plan when she placed the order with Time Warner in February 2012. Haika was confused because she had never heard of MyTechHelp, and had not agreed to purchase any tech support plan from any company. Haika asked Marvin how MyTechHelp gained access to her debit/bank account when she only gave her private financial information to Time Warner. She did not receive a clear answer. Haika demanded a refund of all previous charges. When Marvin refused to issue a refund, Haika demanded to hear the audio recording of the conversation wherein she allegedly agreed to purchase a support plan from MyTechHelp. Marvin said that Haika could not listen to the recording, but that an independent third party would review the audio recording and issue a decision as to whether Haika authorized the charges. Marvin said that MyTechHelp would call her with the results of the independent review. MyTechHelp never called Haika.

65.     On or about August 19, 2013, Haika called MyTechHelp and asked to speak to Marvin about the results of the "independent review" of the audio recording. Haika spoke to several salespersons and was placed on hold multiple times for a significant amount of time. Finally, Haika was connected to Marvin. Marvin claimed that the results of the independent review were inconclusive as to whether Haika agreed to purchase anything from MyTechHelp. Marvin still refused to issue a refund to Haika.

66.     From February 25, 2012 through June 19, 2013, MyTechHelp charged Haika's debit/bank account 15 times in the amount of $9.99 each time. In total, MyTechHelp charged Haika $149.85 for a service that she never agreed to pay for.

67.     At no time did MyTechHelp provide any service or product to Haika.

68.     At no time did Haika authorize MyTechHelp to withdraw $9.99 from her debit/bank account on a recurring basis.

69.     At no time did Haika sign anything authorizing such a recurring charge.

70.     At no time did MyTechHelp provide Haika a copy of any such written authorization.

**JEAN GARD**

71.     In or around March 2013, Plaintiff Jean Gard contacted Apple because she was experiencing problems with her Apple iPad. Specifically, Gard's iPad password was no longer working properly. She searched for Apple's phone number on the internet, and she called the number listed for Apple tech support. At the time, Gard did not know that she had called MyTechHelp.

72.     The MyTechHelp salesperson told Gard that she did not have "AppleCare" for her iPad. AppleCare is the official technical support of Apple Inc. According to Apple's website,

"AppleCare can provide integrated expert support that you can't get anywhere else." Gard thought that she had purchased AppleCare support when she purchased her iPad. However, the MyTechHelp salesperson told Gard that she had "hardware coverage" but not "software coverage." The salesperson told Gard that if she wanted Apple tech support to fix her iPad problem, she would need to purchase a plan for $199.99. At the time of the phone call, Gard had no reason to believe that she was speaking to anyone other than a representative for AppleCare.

73.     Gard reluctantly provided the salesperson with her debit/bank card information because based on the salesperson's representations, Gard's iPad would be rendered worthless without the "software coverage."

74.     After Gard provided the debit/bank card information, the salesperson informed her that the charge for the software coverage was actually $249.99. The saleperson promised Gard that she would receive a $50.00 rebate. The salesperson then provided Gard with a new phone number, and instructed Gard to call the number in 24 hours to receive a new iPad password. The MyTechHelp salesperson had provided Gard with the phone number to the "real" AppleCare.

75.     The next day, Gard contacted the phone number. The AppleCare representative was helpful in solving Gard's iPad problem. The AppleCare representative provided Gard with an email address in case Gard needed to contact Apple tech support in the future.

76.     In August 2013, Gard realized that she had not received the $50.00 rebate that was promised to her. She emailed the representative with whom she last spoke to inquire about the rebate. The AppleCare representative called Gard in response to the inquiry. The AppleCare representative explained that he had no knowledge of any AppleCare rebate program. He asked

Gard to inspect her debit/bank account statement to find out "who" charged "what" to her debit/bank account.

77.     When Gard informed the AppleCare representative that "MyTechHelp" had charged her account $249.99, the representative explained to Gard that MyTechHelp is not affiliated in any way with Apple Inc. or AppleCare.  The AppleCare representative explained that when Gard called in March 2013, she already had the AppleCare coverage needed to fix her iPad password problem, and that the real Apple tech support division would not have charged her a penny to fix her problem.  This was the first time that Gard learned that she had been scammed into giving her debit/bank card information to MyTechHelp.

78.     After charging Gard's debit/bank account $249.99, MyTechHelp provided Gard absolutely nothing.  MyTechHelp failed to provide Gard any service or product.  Instead, MyTechHelp intercepted a call meant for AppleCare, posed as AppleCare, charged Gard $249.99 in exchange for absolutely nothing, and then directed Gard to call the real AppleCare who in turn solved Gard's tech problem for free under her AppleCare service warranty.

79.     At no time did Gard sign anything authorizing such a $249.99 charge from MyTechHelp.

80.     At no time did MyTechHelp provide Gard a copy of any such written authorization.

81.     To date, Gard has not received a $50.00 rebate, and has not been refunded $249.99.

## WIDESPREAD IMPACT

82.     Plaintiffs' experiences with Defendants mirror those of scores of other consumers who have posted their complaints about Defendants on consumer protection websites.  The following examples include a fraction of the complaints which can be found at various websites:

> All I know is I look at bank statement and there it is.  A fraudulent withdrawal from my bank account using my Visa Debit card and it

is listed as Recurring charge.  So, $9.99 out of my bank every month, and I never authorized it. . . It is unbelievable how fearless these companies are at committing fraud against the public unknown to them.  They have potentially crippled me because I never budgeted for a $9.99 withdrawal.  It screwed me up. . .
www.scambook.com

Finally traced a recurring charge on my debit card, which [I] had previously overlooked, and discovered that this "company" had somehow obtained my information. I've never called tech support for any produce/service. My only guess is I had moved and was setting up internet service though Cox Cable in Omaha, NE, and it must have been attached to that original service. New debit card is in the mail. How this can happen to so many people without response is absurd.
www.usaconsumercomplaints.com

Despite my refusal of the plan, I was still billed. . . Not only was I billed the initial 79[].99, I was billed monthly for 9[].99, which essentially meant that I was sold not the 79[].99 plan but a more expensive plan for 200.00.  That was fraud!!!!!!
www.pissedconsumer.com

I had just noticed on my debit card of this charge being taking off my card, I didn't sign up for this, have no idea about this, and would like my money back.. as soon as possible
www.billguard.com

This company says that they charge a one time fix for a certain price $59.99, however after thirty days they automatically debit a recurring payment of $9.99.
www.complaintsboard.com

I have cancelled this numerous times it keeps coming out. For like a year!
www.billguard.com

In November of 2012, my son called Apple Care and they asked for a credit card number.  What he got was MyTechHelp.  What he didn't get was a technician that could solve his problem.  He called repeatedly to make sure they would not charge my credit card but was left on hold for hours.  Three charges of $79.99 between November 2012 and May of 2013 before I noticed the activity.  The "tech" I spoke to said that they would review the tapes and claimed it was not their responsibility if my son thought he was talking to Apple, or, if he could not get back in touch with them to

cancel. It has to be illegal to misrepresent yourself on so many levels.
www.ripoffreport.com

I recently began going over my past statements for the last year and they all say $9.99 charge for mytechhelp which I had no clue what it is[.] I feel cheated out of my money.
www.scambook.com

Charged my bank for 6 months before I realized. My bank called me and asked if this was legitimate. Turns out they double billed me. They credited me for double billing but won't give money back. I asked them to prove where I signed up. Now they keep telling me they will listen to the original call. 30 days and STILL supposedly haven't listed to call even though said it four times. Don't know where to go next—just filed complaint with Office of Consumer Protection.
www.ripoffreport.com

I do not know what this is but they keep charging me even after I called to cancel.
www.billguard.com

I was told that my computer was going to be fixed and it was going to be $99.00 but i found out that on my credit card they had taken out $99.00 one month and the following month another 99.00 a total of $300 and i call them one time to complain and said that it was right it was $300 that the person that i talk to must have forgotten to mention that, really ...!
www.scambook.com

I have no idea where this charge even came from. One month ago I tried to sign up for time warner cable and got stuck with a "saveology" modeum. I told them I was not interested in their tech support. The charge from this same company came out of my account the next day, I called them again and told them that I again was not interested in their services that they cannot charge me again. I checked my bank account this morning and sure enough, I was charged. Looks like i have to cancel this card and get another.
www.scambook.com

We called in December 2012 for help with an iphone issue. They were actually not able to help but we paid $79.99 for the help - which we thought was a one time charge - Turns out I was billed March and June -each $79.99 - it is a quarterly charge - and one needs to call and cancel the "contract" - we were only able to get

Case 4:13-cv-00896-DW   Document 1   Filed 09/13/13   Page 21 of 35

them to refund the June charge -This is a real scam - NO ONE told us it was a quarterly charge for a year!!!
www.merchantcircle.com

This charge has shown up multiple times. I did not sign up for this and would like my money back.
www.billguard.com

Ripoff company[.]  They totally mislead me into believing they were apple tech support[.]  They have been charging my credit card without permission[.]  I had to file multiple disputes and today decided to file a complaint on the FBI fraud website[.]
www.iphonehelpzone.com

I have seen that this charge regularly appears on my Credit card. I have never signed up for any of their services.
www.billguard.com

Googled apple tech support and 877-607-6108 came up. I was told I would be charged a one time fee of 99.99 to resolve problems on my MacBook. I was on the phone with the tech for 4 hours, the issue never was resolved, she hung up before ensuring the issue was resolved and I was charged 99.99 for 3 months. This company is a fraud and I would be warned to use them to help with any Apple product.
www.usaconsumercomplaints.com

83.     Upon information and belief, the same fraudulent and unlawful scheme that was perpetrated on Plaintiffs has been perpetrated on hundreds, if not thousands, of United States residents.

### CLASS ACTION ALLEGATIONS

84.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated as Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure.

85.     Plaintiff Owusu and Plaintiff Haika seek to represent a proposed National Class ("EFTA Class") initially defined as follows:

All United States residents who were charged on their debit/bank accounts for one or more of MyTechHelp's "support plans," on a

recurring basis, during the period of September 13, 2012 to the present.

86.     Plaintiff Gard seeks to represent a proposed Missouri Subclass ("Missouri Subclass") initially defined as follows:

> All Missouri residents who were charged on their debit/bank accounts or credit cards for one or more of MyTechHelp's "support plans" during the period of September 13, 2008 to the present.

87.     Excluded from both the EFTA Class and Missouri Subclass are Defendants, Defendants' parents, subsidiaries and affiliates, their directors, officers and members of their immediate families; also excluded are any federal, state or local government entities, any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

88.     Plaintiffs are members of the EFTA Class and/or the Missouri Subclass (hereinafter referred to collectively as "the Class" unless otherwise specified) which they seek to represent.

89.     Plaintiffs reserve the right to modify the Class descriptions and Class periods based on the results of discovery.

90.     Plaintiffs bring this action on behalf of themselves and on behalf of the Class for relief pursuant to Federal Rule of Civil Procedure 23(b)(3).

91.     **Numerosity:** The proposed Class is so numerous that individual joinder of all its members is impracticable.  Members of the Class number in the hundreds, if not thousands, and members of the Class are geographically dispersed across the United States.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.  The disposition of the claims of the

Class members in a single class action will provide substantial benefits to all parties and to the Court.

92.    **<u>Common Questions of Law and Fact Predominate</u>:** There are questions of law and fact common to the representative Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include, but are not limited to, the following:

a.    Whether MyTechHelp obtained valid authorization from all Class members to electronically withdraw funds from their debit/bank accounts;

b.    Whether the recurring withdrawals from the EFTA Class members' accounts are "preauthorized electronic fund transfers" within the meaning of the EFTA, § 1693a(9) and § 1693e;

c.    Whether MyTechHelp had a duty under the EFTA to obtain EFTA Class members' authorization in writing before debiting fees and/or initiating preauthorized electronic fund transfers from their debit/bank accounts;

d.    Whether MyTechHelp had a duty under the EFTA to provide EFTA Class members a copy of their written authorization prior to debiting fees and/or initiating preauthorized electronic fund transfers from their debit/bank accounts;

e.    Whether MyTechHelp complied with the requirements of the EFTA in connection with the debits and/or preauthorized electronic fund transfers which MyTechHelp initiated from EFTA Class members' debit/bank accounts;

f.    Whether MyTechHelp has violated the EFTA with respect to Plaintiffs and the EFTA Class members;

g.    Whether Defendants' acts and practices are likely to deceive reasonable members of the public;

h.    Whether Defendants' acts and practices amount to deception, fraud, false pretense, false promise, misrepresentation, and/or unfair practice;

i. Whether Defendants' acts and practices amount to concealment, suppression or omission of any material fact in connection with the sale or advertisement of any merchandise;

j. Whether Defendants' acts and practices are justified;

k. Whether Defendants' acts and practices violate Missouri's legislatively declared policies or common law principles as alleged herein;

l. Whether Defendants' acts and practices violate the Missouri Merchandising Practices Act, § 407.010 *et seq.*

m. Whether Defendants wrongfully exercised control of and/or converted Class members' personal property;

n. Whether Defendants have been unjustly enriched;

o. Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

93. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and other members of the Class sustained damages arising out of the same unlawful trade practices based upon the same unlawful marketing and sales tactics. The nature of Defendants' unlawful conduct is the same for Plaintiffs and all members of the Class. The factual bases of Defendants' misconduct are common to the Class members and represent a common thread of unlawful actions resulting in injury to all Class members. Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and all other Class members. The central question of whether MyTechHelp charged consumer accounts without proper permission is common to all Class members and predominates over all other questions, legal and factual, in this litigation.

Case 4:13-cv-00896-DW   Document 1   Filed 09/13/13   Page 25 of 35

94.     **Adequate Representation:**  Plaintiffs are adequate representatives of the Class because they are Class members and do not have interests that conflict with those of the other Class members they seek to represent.  Plaintiffs are represented by experienced and able counsel, who have litigated class action lawsuits, and Plaintiffs' Counsel intend to prosecute this action vigorously for the benefit of the Class.  Plaintiffs and their Counsel will fairly and adequately protect the interests of the Class members.

95.     **Predominance and Superiority:**  This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.  Should individual Class members be required to bring separate actions, this Court and/or the courts throughout Missouri and the United States would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision of a single court.  Furthermore, for many, if not most, Class members, a class action is the only feasible mechanism that allows therein an opportunity for legal redress and justice.  Adjudication of individual Class members' claims with respect to Defendants would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class members to protect their interests.

**VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. § 1693 *ET SEQ.***
**(BROUGHT BY THE EFTA CLASS AGAINST DEFENDANT MYTECHHELP LLC)**

96.　　Plaintiff Owusu and Plaintiff Haika, individually and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

97.　　The Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* (the "EFTA"), subjects electronic money transfers to procedural requirements designed to protect consumers from transactions made in error or without the consumer's consent.

98.　　The term "account" is defined in the EFTA, in relevant part, as "a demand deposit, savings deposit, or other account (other than an occasional or incidental credit balance in an open end credit plan . . .)," "established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement." 15 U.S.C. § 1693a(2). A debit/bank account is an "account" as that term is defined in the EFTA.

99.　　The term "consumer" is defined in the EFTA as "a natural person." 15 U.S.C. § 1693a(6).

100.　　The EFTA defines "electronic fund transfer," in relevant part, as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7).

101.　　The EFTA defines "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10).

102. Plaintiffs and the EFTA Class members maintained an "account" as that term is defined in 15 U.S.C. § 1693a(2).

103. Plaintiffs and the EFTA Class members are "consumers" as that term is defined in 15 U.S.C. § 1693a(6).

104. As herein alleged, MyTechHelp engaged in "preauthorized electronic fund transfers" as that term is defined in 15 U.S.C. § 1693a(10), by electronically debiting funds from Plaintiffs' and the EFTA Class members' accounts on a substantially regular basis.

105. Pursuant to 15 U.S.C. § 1693e(a), MyTechHelp was required by law to obtain Plaintiffs' and the EFTA Class members' written consent and provide a record of that written consent prior to initiating and securing recurring charges to Plaintiffs' and the Class members' accounts.

106. MyTechHelp initiated and secured electronic fund transfers without first obtaining Plaintiffs' and the EFTA Class members' written consent, and without first providing Plaintiffs and the EFTA Class members a record of that written consent.

107. Plaintiffs and the members of the EFTA Class have suffered damages as a result of MyTechHelp's violations of the EFTA.

108. Pursuant to 15 U.S.C. § 1693m, Plaintiffs and the members of the EFTA Class seek actual damages, statutory damages, reasonable costs and attorneys' fees, and an injunction against further violations.

## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, § 407.010 *ET SEQ.*
### (BROUGHT BY THE MISSOURI SUBCLASS AGAINST ALL DEFENDANTS)

109.    Plaintiff Gard, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

110.    This cause of action is brought pursuant to the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.* (the "MMPA").

111.    The MMPA provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. . . in and from the State of Missouri, is declared to be an unlawful practice. . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation. Mo. Ann. Stat. § 407.020.

112.    This action is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by Defendants on behalf of Plaintiff and the Missouri Subclass members. Defendants' acts of deception, including but not limited to knowingly and purposefully communicating with consumers in a deceptive manner; and knowingly and purposefully initiating and securing charges to accounts, without the prior knowledge, consent and/or written authorization of the owner of the account, are unconscionable, unfair, and deceptive acts or practices, and constitute multiple, separate violations of the MMPA.

113.    Defendants engaged in the unlawful practices as set forth in this Complaint in the sale of "merchandise" (services), as that term is defined by the MMPA, which are primarily used for personal, family or household purposes.

114.    Plaintiff and the Missouri Subclass members are "persons", as that term is defined in the MMPA, who purchased services from Defendants primarily for personal, family or household purposes.

115.    Defendants' deception, misrepresentations and/or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and members of the Missouri Subclass regarding Defendants' services.

116.    Defendants, in connection with the marketing and sale of Defendants' services, engaged in deceptive, fraudulent, and misleading practices in violation of the MMPA as set forth in this Complaint.

117.    The deception perpetrated by Defendants in violation of the MMPA was consistent, uniform, continuous, pervasive and widespread during the Class period.

118.    Defendants' conduct directly and proximately caused or contributed to cause damage in fact and an ascertainable loss of money or property to Plaintiff and the members of the Missouri Subclass in that Defendants initiated and secured charges to accounts, without the prior knowledge, consent and/or written authorization of the owner of the account.  The resulting damage to Plaintiff and the Missouri Subclass members was foreseeable to Defendants.

119.    Plaintiff and the members of the Missouri Subclass are entitled to recover their actual damages, attorneys' fees, and injunctive or other equitable relief, pursuant to Missouri law, including the MMPA.

120.    All of the acts and activities of Defendants, as set forth in this Complaint, were performed willfully, intentionally, fraudulently, maliciously, knowingly, conspiratorially and with the conscious disregard of the rights of Plaintiff and all Missouri Subclass members, and

warrant an award of punitive damages to deter Defendants, and others in similar circumstances, from committing such actions in the future.

## COUNT III
### CONVERSION
#### (BROUGHT BY THE MISSOURI SUBCLASS AGAINST ALL DEFENDANTS)

121.    Plaintiff Gard, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

122.    Defendants have converted to their own use identifiable sums of money and/or personal property belonging to members of the Missouri Subclass through unlawful acts and conduct, as described in this Complaint.

123.    Defendants knowingly and intentionally transferred, retained, and converted such sums of money and/or personal property to their own use, without the consent, knowledge, and/or authorization of the members of the Missouri Subclass.

124.    The specific sum of Plaintiff's and each Missouri Subclass member's money and/or personal property that was converted by Defendants is readily identifiable from information and records in Defendants' possession, custody, or control.

125.    As a direct and proximate result of Defendants' unlawful acts and conduct, the members of the Missouri Subclass were deprived of the use of their own money and/or personal property, which money and/or property was unlawfully and wrongfully converted by Defendants.

126.    Plaintiff and the Missouri Subclass are thereby entitled to and seek restoration of their monies, along with interest on these monies from the date said monies were converted by Defendants to the date of the judgment, as well as compensatory damages.

Case 4:13-cv-00896-DW   Document 1   Filed 09/13/13   Page 31 of 35

127.    All of the acts and activities of Defendants, as set forth in this Complaint, were performed willfully, intentionally, fraudulently, maliciously, knowingly, conspiratorially and with the conscious disregard of the rights of all Missouri Subclass members, and warrant an award of punitive damages to deter Defendants, and others in similar circumstances, from committing such actions in the future.

## COUNT IV
### UNJUST ENRICHMENT
### (BROUGHT BY THE MISSOURI SUBCLASS AGAINST ALL DEFENDANTS)

128.    Plaintiff Gard, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

129.    Defendants knowingly and without the consent, knowledge and/or authorization of the account owner, charged the accounts of Plaintiff and the other members of the Missouri Subclass.

130.    As a result, and despite having no valid or legal basis to do so, Defendants unjustly received and continue to receive a monetary benefit in the form of fees charged to those accounts.

131.    Defendants appreciate and/or have knowledge of these benefits.

132.    Defendants' acceptance and retention of these benefits under the circumstances make it inequitable for Defendants to retain the ill-gotten benefits that they received from Plaintiff and the members of the Missouri Subclass.

133.    Defendants, by the deliberate and fraudulent conduct complained of herein, have been unjustly enriched in a manner that warrants restitution.

134.    As a proximate consequence of Defendants' improper and unlawful conduct, Plaintiff and the members of the Missouri Subclass were injured.

135.    Plaintiff and the members of the Missouri Subclass are entitled to restitution for Defendants' unlawful conduct, as well as interest, reasonable costs and attorneys' fees.

136.    Plaintiff and the members of the Missouri Subclass have no adequate remedy at law against Defendants.

## COUNT V
### INJUNCTIVE RELIEF
### (BROUGHT BY THE MISSOURI SUBCLASS AGAINST ALL DEFENDANTS)

137.    Plaintiff Gard, individually and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

138.    Defendants have refused to act on grounds generally applicable to Plaintiff and the members of the Missouri Subclass, thereby making final injunctive relief appropriate.

139.    Defendants' conduct, as more fully set forth herein, both in the past and through the present day, has demonstrated a willful disregard for the rights of consumers, and persists in their deceptive and unfair marketing and sales practices to the detriment of consumers across the country.

140.    If Defendants are allowed to continue with these illicit practices, Plaintiff and members of the Missouri Subclass will be irreparably harmed in that they do not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged in this Complaint, unless injunctive relief is granted to stop Defendants' improper conduct.

141.    Plaintiff and the members of the Missouri Subclass are entitled to an injunction requiring Defendants to cease their unfair and deceptive marketing and sales practices, as alleged herein, including the effects thereof.

142.    Plaintiff and members of the Missouri Subclass seek a Court Order requiring Defendants to discontinue initiating charges to consumer accounts without receiving prior written consent from the owner of the account and without providing the owner of the account a copy of such authorization.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class request the Court enter an order or judgment against Defendants as follows:

1.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Federal Rule of Civil Procedure 23, and certification of the proposed Class and notice thereto to be paid by Defendants;

2.    Designating Plaintiffs as representatives of the Class and their counsel as Class counsel;

3.    Adjudging and decreeing that Defendants have engaged in the conduct alleged herein, entering Judgment in favor of Plaintiffs and the Class and against Defendants;

4.    Awarding Plaintiffs and the Class their individual damages and attorneys' fees and allowing costs, including interest thereon; damages as permitted under the state and federal statutes referenced herein; and/or restitution and equitable relief;

5.    Entering an injunction ordering Defendants to cease and desist from engaging in the unfair, unlawful, deceitful, and fraudulent practices alleged in this Complaint, and awarding such other injunctive relief as described herein;

6.   Awarding special damages according to proof on certain causes of action;

7.   Awarding both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded; and

8.   Granting any and all such other and further relief that this Court may deem just and proper.

HOLLORAN WHITE SCHWARTZ & GAERTNER LLP

/s/ Thomas E. Schwartz
Thomas E. Schwartz, #MO44504
2000 So. 8th Street
St. Louis, Missouri 63105
(314) 772-8989 Phone
(314) 772-8990 Fax
tschwartz@halloranlaw.com
ATTORNEYS FOR PLAINTIFFS